IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHEDRIC FINKLEA, | ) | CASE NO. 1:16-cv-01269 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Shedric Finklea ("Plaintiff" or "Finklea") seeks judicial review of the partially favorable final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") finding Finklea disabled from November 14, 2011, through June 1, 2013, but finding that Finklea was not disabled from the alleged onset date of January 14, 2011, until November 14, 2011, and that Finklea's disability ended on June 2, 2013. Doc. 1, Tr. 13. At issue in this case is the Administrative Law Judge's determination regarding the January 14, 2011, through November 14, 2011, time period and his determination regarding the time period after June 1, 2013.

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 11. For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

# I. Procedural History

Finklea protectively filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on May 2, 2013.[1]  Tr. 156, 173, 348-354, 366-373, 410. He alleged a disability onset date of January 14, 2011.  Tr. 348, 366, 410.  Finklea alleged disability due to back problems, bronchitis, asthma, problems with left hip, depression, high blood pressure, and sciatic nerve.  Tr. 209, 219, 415.  Finklea's applications were denied initially (Tr. 209-215) and upon reconsideration by the state agency (Tr. 219-225).   Thereafter, he requested an administrative hearing.  Tr. 226-228.  On October 17, 2012, Administrative Law Judge Thomas M. Randazzo ("ALJ Randazzo") conducted an administrative hearing (Tr. 50-105) and, on January 4, 2013, ALJ Randazzo issued an unfavorable disability decision (Tr. 174-197).

Finklea requested review of ALJ Randazzo's decision by the Appeals Council.  Tr. 262. Initially, on August 6, 2014, the Appeals Council indicated it intended to adopt ALJ Randazzo's decision (Tr. 199, 273-276) but subsequently, on September 19, 2014, the Appeals Council decided that it was necessary to remand the case for further proceedings before an Administrative Law Judge for consideration of Finklea's November 2012 hip replacement surgery in determining whether Finklea met a listing and in assessing his credibility and RFC; for consideration of Finklea's obesity; and for consideration of his disability claim under both Title II and Title XVI.  Tr. 12, 199-200.

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 6/16/2017).

Pursuant to the Appeals Council's remand order, on April 9, 2015, Administrative Law Judge Peter Beekman ("ALJ") conducted an administrative hearing. Tr. 106-132. Thereafter, on June 8, 2015, the ALJ issued a partially favorable decision. Tr. 8-49. The ALJ concluded that:

> After careful consideration of all the evidence, I conclude that the claimant was "disabled" within the meaning of the Social Security Act from November 14, 2011 through June 1, 2013. I also find that the insured status requirements of the Social Security Act were met as of the date disability was established. On June 2, 2013, medical improvement occurred that is related to the ability to work, and the claimant has been able to perform substantial gainful activity from that date through the date of this decision. Thus, the claimant's disability ended on June 2, 2013.

Tr. 13.

Finklea requested review of the ALJ's decision by the Appeals Council. Tr. 6-7. On April 5, 2016, the Appeals Council denied Finklea' request for review, making the ALJ's June 8, 2015, decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal, vocational and educational evidence

Finklea was born in 1966. Tr. 348, 366, 410. Finklea's past work included event security worker, machine operator, laborer, and shelter monitor. Tr. 113-114, 121-125. Finklea was incarcerated from 1991 until 2003 and from June 2007 until June 2008. Tr. 61-63. Finklea obtained his GED and completed four years of college through Ashland while he was in prison. Tr. 66. Finklea did not receive a degree but obtained certificates for business and office skills. Tr. 66-67, 116. Also while in prison, he received a tutoring certificate and served as a tutor. Tr. 65, 66-67. He also worked on trying to complete a hospitality management program while he was in prison but was released before he was able to complete the program. Tr. 66. After his release from prison in 2008, Finklea stayed in a shelter and he eventually started working there

about three day per week.  Tr. 63-64.  He sat at a check-in desk at the shelter and checked people

in.  Tr. 64.

**B.     Medical evidence**[2]

On March 23, 2010, Finklea presented to St. Vincent Charity's emergency room with

complaints of back, hip and thigh pain.  Tr. 1302-1308.  Finklea reported that the left leg and hip

pain was present for about one month and that the pain was constant.  Tr. 1306.  Finklea was

observed to be ambulating well.  Tr. 1306.  His gait was normal.  Tr. 1303.  On examination,

Finklea exhibited pain at 30 degrees on straight leg raise on the right.  Tr. 1303.   The emergency

room diagnosis was sciatica on the left, acute, and he was discharged home.  Tr. 1303.

On May 14, 2010, Finklea was back at the emergency room.  Tr. 1314-1333.  He was

seen at Euclid Hospital.  Tr. 1315.  Finklea complained of chest pain and chronic left hip pain

that was worse recently without any new injury.  Tr. 1318.  A left femur x-ray was taken, which

showed bullet fragments in the medial aspect of the left thigh, degenerative changes of the left

hip joint, and no acute fracture or dislocation.  Tr. 1325.  An x-ray of the pelvis showed

degenerative changes in both hips, greater on the left.  Tr. 1325-1326.  On examination,

Finklea's gait was within normal limits, his extremities were non-tender, he moved all

extremities, and there was no pedal edema.  Tr. 1319.  Finklea was discharged the same day with

diagnoses of degenerative joint disease and hypertension.  Tr. 1324.

On October 27, 2010, Finklea saw Dr. Lorraine Stern in the orthopeadics department at

MetroHealth Medical Center regarding his hip pain.  Tr. 1343.  Finklea indicated that he had a

history of hip pain.  Tr. 1343.  His hip pain had been intermittent but was becoming more

---

[2] Finklea's arguments are focused on his hip impairment and complaints of pain and he does not rely on medical opinion evidence to support his contention that the ALJ erred in evaluating his claims.  Also, the ALJ's decisions contains an extensive discussion of Finklea's medical history and the opinion evidence.  Tr. 17-25, 27-34, 36-40. The medical evidence is summarized herein in light of the foregoing.

frequent. Tr. 1343. He reported being able to walk for about 30 minutes without pain and walking with a cane at all times. Tr. 1343. X-rays taken on October 27, 2010, of the pelvis and left hip showed osteoarthritic changes involving the left hip. Tr. 1398. Dr. Stern assessed moderate left hip osteoarthritis and discussed with Finklea the likelihood of needing a total hip replacement in the future but indicated that Finklea was too young at that point to have total hip replacement. Tr. 1344. A referral was provided for physical therapy for range of motion and strengthening and he was provided Naproxyn for pain. Tr. 1344.

On November 4, 2010, Finklea was seen by MetroHealth Family Practice Clinic as a new patient to establish a relationship. Tr. 1338-1342. One of Finklea's complaints was hip pain with osteoarthritic changes. Tr. 1338. Other medical conditions noted were mild persistent asthma and hypertension, NOS. Tr. 1338. It was noted that Finklea was not compliant with his hypertension medication. Tr. 1341.

Pursuant to Dr. Stern's referral, on December 1, 2010, Finklea started physical therapy. Tr. 1501-1506. The physical therapist observed decreased hip AROM, decreased hip strength, reduced right lower extremity flexibility, an altered gait pattern, and positive findings related to osteoarthritis diagnosis of the left hip. Tr. 1505. The physical therapist recommended physical therapy for six visits. Tr. 1505. During his third physical therapy visit on December 27, 2010, Finklea reported that his hip pain was a lot better. Tr. 1472. He tolerated the exercises with no complaints of pain. Tr. 1473. Manual therapy helped reduced Finklea's left hip pain to a 0/10. Tr. 1473. Finklea's blood pressure was okay at the start of the physical therapy session but, by the middle of the session, Finklea's blood pressure had risen above an appropriate range and exercise was stopped. Tr. 1473.

On March 15, 2011, a new course of physical therapy was started. Tr. 1458. Prior physical therapy treatment had failed due to Finklea's hypertension. Tr. 1459. The diagnosis was left hip arthritis. Tr. 1458. Finklea complained of low back pain, hip pain, left lower extremity numbness down to the toes, difficulty walking due to pain, and difficulty staying in one position for an extended period of time. Tr. 1459. His main complaint was his walking endurance, which was limited to one city block. Tr. 1459. The physical therapist recommended 10 physical therapy visits. Tr. 1461.

During a March 31, 2011, visit with his primary care physician for follow up regarding his hypertension, Finklea reported that he was not taking his medication regularly. Tr. 1442. He just took his medication when he felt like it. Tr. 1442. After a number of denials, Finklea admitted that he was using cocaine almost two times each week. Tr. 1442. Following his visit with his primary care physician on March 31, 2011, Finklea attended his second physical therapy session. Tr. 1447. He reported 0/10 pain. Tr. 1447. Due to hypertension, physical therapy exercises had to be postponed. Tr. 1447. The physical therapist observed that Finklea's hip range of motion was now within normal limits. Tr. 1447. FABER position was still limited. Tr. 1447. Finklea's strength had increased to 4/5 in hip flexion and abduction. Tr. 1447. Finklea's doctor cleared Finklea to continue with physical therapy but with limited exertion. Tr. 1447.

On April 15, 2011, Finklea was seen at the emergency room for left hip pain and right leg numbness. Tr. 1430-1438. Finklea was diagnosed with acute chronic left hip pain and advised to follow up with the orthopedic clinic. Tr. 1437. On April 20, 2011, Finklea followed up with the orthopedic department and saw Dr. Jonathan E. Belding, M.D. Tr. 1428-1429. He was last seen by the orthopedic department for his hip pain in October 2010. Tr. 1428. Finklea continued to report that he was walking with a cane at all times. Tr. 1428. He indicated he could only walk

for about 30 minutes without pain. Tr. 1428. Dr. Belding discussed the likelihood of needing total hip replacement in the future but again advised Finklea that he was too young to have joint replacement. Tr. 1428. Dr. Belding discussed and Finklea was interested in receiving a joint injection. Tr. 1429. Considering Finklea's young age, conservative management of his hip osteoarthritis was recommended. Tr. 1429.

Following an injection, on June 20, 2011, Finklea saw Dr. Jonathan B. Macknin, M.D., of the orthopedic department for follow up. Tr. 1573. Finklea reported relief from his hip symptoms for about a month and a half, indicating that his hip pain was somewhat less than it was prior to the injection. Tr. 1573. Also, he was not using his cane and overall reported ambulating better. Tr. 1573. On September 19, 2011, Finklea returned to the orthopedic department reporting that his pain had returned to baseline. Tr. 1577. He reported stiffness and increased pain after activity. Tr. 1577. He had started to use his cane again for ambulation in the community. Tr. 1577. It was recommended that another injection be considered since Finklea had obtained adequate pain relief previously. Tr. 1577. Also NSAIDs as prescribed by his primary care physician were recommended. Tr. 1577.

On September 30, 2011, another steroid injection was administered in Finklea's left hip. Tr. 1580. During a November 8, 2011, primary care visit, Finklea reported that that the injection he had received a few weeks earlier had not helped. Tr. 1583. He indicated that his pain had been getting worse in the prior few weeks, indicating that his pain was constant and he rated it as 10/10. Tr. 1583. He had stopped taking Naprosyn, stating it did not work. Tr. 1583. He was using a cane while walking. Tr. 1583. On examination, both hips appeared grossly normal. Tr. 1584. Finklea's left hip was non-tender to palpation. Tr. 1584. No erythema or swelling was noted. Tr. 1584. There was limited active movement, which according to Finklea was due to

pain. Tr. 1584. Finklea exhibited normal passive range of motion; strength was 5/5; and there was normal tone and reflexes. Tr. 1584. It was recommended that Finklea return to orthopedics for his hip. Tr. 1584. A few Percocet pills were provided to Finklea pending his orthopedic visit. Tr. 1584.

On November 14, 2011, Finklea was seen again by the orthopedic department. Tr. 1597-1598. An x-ray was taken of the left hip showing "[p]rogressive degenerative arthritic change involving left hip. There is a superimposed acute fracture involving the superior lateral aspect of the acetabulum." Tr. 1599.

In July 17, 2012, Finklea met with the orthopaedic department to discuss total left hip replacement surgery, indicating he had been approved for Medicaid and was interested in proceeding with the surgery. Tr. 1800. On July 24, 2012, Finklea's doctors reviewed his left hip x-rays and agreed to proceed with left hip replacement. Tr. 1797, 1799. Total hip replacement surgery was originally scheduled for August 31, 2012, but the surgery had to be cancelled because Finklea's blood pressure was elevated. Tr. 1773, 1781. Ultimately, on November 23, 2012, Finklea underwent left total hip replacement surgery. Tr. 2268-2273. From November 26, 2012, through December 5, 2012, Finklea was in a rehabilitation facility. Tr. 2300-2301. At discharge, Finklea's condition had improved and he was ambulatory with use of a walker. Tr. 2406. Finklea had physical therapy and occupational therapy appointments and was instructed to follow up with his primary care physician. Tr. 2406.

On August 7, 2013, Finklea was seen in the emergency room following a fall that occurred while he was carrying things down stairs. Tr. 2415-2417. Finklea strained his back. Tr. 2416. There was concern that Finklea's fall might have caused injury or damage to his hip

replacement hardware but x-rays were taken of the hip and pelvis and there were no new injuries. Tr. 2416, 2423-2424.

On August 22, 2013, Finklea was seen at his primary care physician's office with complaints of left hip pain that he had been having for two days. Tr. 2450. Finklea noted that the pain was sudden and occurred while he was loading stuff into his truck. Tr. 2450. Finklea received a Toradol injection and an x-ray was taken. Tr. 2452. No acute fracture was shown on the x-ray. Tr. 2451, 2458. On August 17, 2013, Finklea returned to orthopedics. Tr. 2461. He reported that he had fallen on his left hip about two weeks prior and injured it again a week after that while lifting heavy objects into a truck. Tr. 2461. Finklea had been taking Percocet with good relief but had not tried anti-inflammatories. Tr. 2461. The assessment was left hip abductor strain. Tr. 2461. There were no implant issues observed. Tr. 2461. Activity modification was recommended along with use of heat/ice and NSAIDs. Tr. 2461. Finklea was advised to follow up in one year for routine total hip replacement follow up. Tr. 2461. During a September 17, 2013, follow-up visit with his primary care physician, Finklea complained of pain in his left hip but noted that his pain was slightly improved and he reported being able to ambulate. Tr. 2466. Diagnoses from the September 17 visit were hip disease; hypertension, NOS; difficultly walking; and blurry vision. Tr. 2470.

In April 2014, Finklea was referred for a nutrition assessment to treat his obesity. Tr. 2647. During the April 2014, assessment, Finklea reported working part-time as a repairman. Tr. 2649. Finklea indicated he wanted to start some form of exercise. Tr. 2649. He indicated he had an outdoor bike and wanted to do push-ups. Tr. 2649. He stated that, because of his hip surgery, he could not walk as much as he wanted. Tr. 2649. During a May 21, 2014, visit regarding his nutrition, Finklea reported that he had exercised once by riding his bike. Tr. 2666.

He reported being sore after riding his bike for 2-3 hours so he did not try it again. Tr. 2666. The nutritionist recommended that Finklea try riding his bike 30 minutes, 5 times per week, if okay with his doctor, and slowly work up to doing more to avoid pain. Tr. 2666.

May 24, 2015, x-rays of the hip and pelvis showed normal position and alignment and appearance of the left total hip prosthesis; a healed fracture of the superior left acetabulum with a small bony density in adjacent soft tissues; the heterotopic bone along the greater trochanters was unchanged; and the right hip and sacroiliac joints appeared normal bilaterally. Tr. 2672.

**C.     Testimonial evidence**

**1.     Plaintiff**

Finklea testified at and was represented at both the October 17, 2012, hearing and the April 9, 2015, hearing. Tr. 58-93 (10/17/12 hearing); Tr. 114-125 (4/9/15 hearing).

_October 17, 2012, hearing testimony_

Finklea indicated that the main reason he could not work was because of his hip. Tr. 78. Finklea explained that he had been shot twice in the past. Tr. 59. He was shot once in the right leg in 2000 and he was also shot in his left leg. Tr. 59. Finklea took the bullet out of his right leg himself but the bullet remained lodged in his left leg. Tr. 59-60. The lodged bullet in Finklea's left leg continued to cause him pain in that leg. Tr. 60. Finklea also has pain in his hip due to degenerative changes and a fracture. Tr. 60. Finklea stated that he had to leave the shelter monitoring job because he could barely walk and it hurt to sit. Tr. 73, 84. He also noted, however, that the shelter monitoring job was seasonal – just during the winter. Tr. 84. One doctor told him the pain was caused by his sciatic nerve but another doctor informed him that his back pain was from his hip. Tr. 73.

Finklea indicated that walking without a cane was really difficult and hurt a lot. Tr. 83. He reported that sometimes his hip will give out on him causing him to fall. Tr. 83. He indicated he was able to walk around his house without his cane but not outside. Tr. 84. Finklea explained that sitting hurt him in his hip and lying down hurt as well. Tr. 84-85.

Finklea had been scheduled to have hip replacement surgery in September 2012 but the surgery had to be cancelled because his blood pressure was too high. Tr. 86. Finklea tried injections in his hip which gave him some relief but the amount of relief he received from the injections decreased with each subsequent injection. Tr. 86-87. For example, he had three injections and, with the first injection, he had relief for about two months; with the second injection, he had relief for about a month; and with the third injection, he had relief for about a week and a half. Tr. 87. Finklea stated that his pain became very severe around 2010, indicating the pain just started getting worse and worse and he had to go back and forth to the hospital to try to figure out what was wrong. Tr. 90-91.

_April 9, 2015, hearing testimony_

At the April 9, 2015, hearing, Finklea was not using a cane or walker. Tr. 114-115. Finklea reported that he had stopped using cocaine about five years prior. Tr. 116. Finklea was using a CPAP machine and he was using Albuterol and Symbicort for his lungs. Tr. 116-117. Finklea used a rescue inhaler 3-4 times per day. Tr. 117. He was 5'10" tall and weighed 299 pounds. Tr. 116. Finklea indicated that, since his hip replacement surgery, his hip and back still hurt if he walked a certain amount of time, indicating that he could walk about three blocks, two or three times, and then he has to use a cane and/or rest. Tr. 116. Regarding how he felt in 2010, Finklea stated that he used a cane and could not do much of anything. Tr. 118. While in the shelter he was staying at, he would walk to the kitchen to eat and then back to his bunk and sit in

front of the television.  Tr. 118.  He was unable to get into a stand-up shower and he had a difficult time dressing himself.  Tr. 119.

### 2. Medical Expert

At the April 9, 2015, hearing, the ALJ called Arthur Brovender, M.D., an orthopaedic specialist, to testify as a medical expert.  Tr. 109-112, 316-317, 320-323.  Dr. Brovender testified that the record reflected that Finklea had osteoarthritis of the left hip, identifying an October 27, 2011, x-ray which showed osteoarthritis of the left hip.  Tr. 109.  Dr. Brovender noted that Finklea was 270 pounds and used a cane.  Tr. 109.  He identified a November 14, 2011, x-ray which showed osteoarthritis of the left hip with a fracture and indicated that Finklea had left hip replacement surgery, citing records showing the left hip replacement surgery occurred on November 23, 2012.  Tr. 2268-2272.  Initially Dr. Brovender indicated that Finklea equaled a listing from January 14, 2011 until June 1, 2013, but clarified that the listing level impairment started on November 14, 2011, which was when there was evidence of fracture in the left hip.  Tr. 110-111.  Finklea's counsel questioned Dr. Brovender about the start date of the listing level impairment, pointing out evidence of documented hip pain dating back to October 27, 2010, and use of a cane at all times to walk; and evidence of left hip osteoarthritis with an indication that Finklea would likely need hip replacement.  Tr. 110-111 (citing Exhibit 3F, pp. 10-11 (Tr. 1343-1344)).  Dr. Brovender responded, "Okay, That's the key word, likely.  He didn't need it at that point.  He needed it at the date . . . when he had a fracture . . . 11/14/2011."  Tr. 111.

### 3. Vocational Experts

Vocational Expert Thomas Nimberger ("VE Nimberger") testified at the October 17, 2012, hearing.  Tr. 93-104.  Vocational Expert Gail Klier ("VE Klier") testified at the April 9, 2015, hearing.  Tr. 112-114, 125-131.

During the April 9, 2015, hearing, VE Klier described Finklea's past work as an event security worker, machine operator, laborer, and shelter monitor. Tr. 113-114, 121-125. The VE indicated that the event security worker position was titled in the DOT as security guard and it was classified as a light, semi-skilled job. Tr. 113, 121-122. The machine operator position was titled in the DOT as machine operator general and it was classified as a medium, semi-skilled job, which Finklea performed at the heavy level. Tr. 113-114, 122-124. The laborer position was titled in the DOT as general laborer and it was classified as a heavy, unskilled job. Tr. 114, 124-125. Lastly, Finklea's shelter monitor position was classified as a medium, semi-skilled position, which Finklea performed at the light level. Tr. 114.

The ALJ then asked the VE two hypothetical questions. Tr. 125-130. In the first hypothetical, the ALJ asked the VE to assume an individual who can lift /carry 20 pounds occasionally and 10 pounds frequently; stand and walk 6 out of 8 hours; sit 6 out of 8 hours; would require a 10 second sit/stand option every 30 minutes without being off task; occasionally use a ramp or stairs but never use a ladder, rope or scaffold; occasionally balance, stoop, kneel, crouch, or crawl; constantly use his hands for reaching, handling, fingering, and feeling; visual capabilities and communication skills are constant; should avoid high concentrations of heat, cold, humidity, smoke, fumes, dust, and pollutants; should avoid entirely dangerous machinery and unprotected heights; can perform simple, routine tasks and tasks that would take more than 3 months but up to 6 months to learn; and tasks should be low stress, meaning no high production quotas, no piece rate work, and no work involving arbitration, confrontation, negotiation, supervision, or commercial driving. Tr. 126. The VE indicated that all past work, with the exception of the shelter monitor job, would be excluded based on the first hypothetical. Tr. 127. The VE indicated that there would be jobs in significant numbers in the national and regional

economies that the hypothetical individual could perform, including usher, ticket taker, and order caller. Tr. 127-128. All three jobs identified were light, unskilled positions and the VE identified national, state, and regional job incidence data for each of the identified jobs. Tr. 127.

In the second hypothetical, the ALJ asked the VE to consider an individual who could carry 10 pounds occasionally and 10 pounds frequently; stand and walk 2 out of 8 hours; sit for 6 out of 8 hours; would require a 10 second sit/stand option every 30 minutes without being off task; occasionally use a ramp or stairs; never use a ladder, rope or scaffold; frequently balance and stoop; occasionally kneel and crawl; no manipulative, visual or communication deficits; should avoid high concentrations of heat, cold, humidity, smoke, fumes, dust, and pollutants; should avoid entirely dangerous machinery and unprotected heights; can perform simple, routine tasks and tasks that would take more than 3 months but up to 6 months to learn; and tasks should be low stress, meaning no high production quotas, no piece rate work, and no work involving arbitration, confrontation, negotiation, supervision, or commercial driving. Tr. 128-129. The VE indicated that there would be jobs available that the hypothetical individual could perform, including surveillance system monitor, addresser, and document preparer. Tr. 129-130. All three jobs identified were sedentary, unskilled positions and the VE identified national, state, and regional job incidence data for each of the identified jobs. Tr. 129-130. The VE indicated that, in the current labor force, the addresser and document preparer jobs were often parts of other clerical jobs. Tr. 129. As result, the VE reduced the job incidence data for each of those jobs by half. Tr. 129-130.

Finklea's counsel asked the VE whether the sedentary jobs identified would remain available if additional limitations of needing a cane whenever standing or walking and having no interaction with the public and minimal and superficial interaction with coworkers and

supervisors were added.  Tr.  130-131.  In response, the VE indicated that those jobs would not remain.  Tr. 131.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[3] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[4] claimant is presumed disabled without further inquiry.

---

[3] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[4] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

4.　　　If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.　　　If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[5] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his June 8, 2015, decision, the ALJ made the following findings:[6]

1.　　　Finklea meets the insured status requirements through December 31, 2012. Tr. 16.

2.　　　Finklea has not engaged in substantial gainful activity since November 14, 2011, the date he became disabled. Tr. 16.

3.　　　Since Finklea's alleged onset date of disability, January 14, 2011, Finklea has had the following severe impairments: osteoarthritis of the left hip, obstructive sleep apnea, asthma, obesity, depressive disorder and personality disorder. Tr. 16-17.

---

[5] The DIB and SSI regulations cited herein are generally identical. Accordingly, in some instances herein, for convenience, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[6] The ALJ's findings are summarized.

4.      Prior to November 14, 2011, the date Finklea became disabled, Finklea did not have an impairment or combination of impairments that meets or medically equals the severity of a Listing.  Tr. 17-18.

5.      Prior to November 14, 2011, the date Finklea became disabled, Finklea had the RFC to perform sedentary work except he can stand and walk for a total two (2) hours in an eight (8) hour workday with normal breaks and sit for a total of six (6) hours in an eight (8) hour workday with normal breaks. He requires the option to sit or stand for ten (10) seconds every thirty (30) minutes without being off task. He can occasionally climb ramps and stairs, but never climb ladders, ropes and scaffolds; frequently balance and stoop, but only occasionally kneel, crouch or crawl. He must avoid high concentrations of heat, cold, humidity, smoke, fumes, dust and pollutants. He must avoid all exposure to dangerous machinery and unprotected heights.  He has the ability to perform simple, routine tasks including tasks that would take more than three (3) months and up to six (6) months to learn. He can perform low stress tasks meaning no high production quotas, no piece rate work or work involving arbitration, confrontation, negotiation, supervision or commercial driving.  Tr. 18-25.

6.      Since January 14, 2011, Finklea has been unable to perform any past relevant work.  Tr. 25.

7.      Prior to the established disability onset date, Finklea was a younger individual age 18-44.  Tr. 25.

8.      Finklea has at least a high school education and is able to communicate in English.  Tr. 25.

9.      Prior to November 14, 2011, transferability of job skills is not material to the determination of disability.  Tr. 25.

10.     Prior to November 14, 2011, considering Finklea's age, education and work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Finklea could have performed, including surveillance system monitor, addresser, and document preparer. Tr. 25-26.

11.     Finklea was not disabled prior to November 14, 2011, but became disabled on that date and continued to be disabled through June 1, 2013.  Tr. 27.

12.     From November 14, 2011, through June 1, 2013, the period during which Finklea was disabled, the severity of Finklea's osteoarthritis of the left hip medically equaled the criteria of Listing 1.02 – Major Dysfunction of a Joint.  Tr. 27-34.

13.     Finklea was under a disability from November 14, 2011, through June 1, 2013.  Tr. 34.

14.     Finklea's substance use disorder is not a contributing factor material to the determination of disability.  Tr. 34.

15.     Finklea has not developed any new impairment or impairments since June 2, 2013, the date his disability ended.  Thus, Finklea's current severe impairments are the same as that present from November 14, 2011, through June 1, 2013.  Tr. 34.

16.     Beginning June 2, 2013, Finklea has not had a severe impairment or combination of impairments that meets or medically equals the severity of a listing.  Tr. 34-35.

17.     Medical improvement occurred as of June 2, 2013, the date Finklea's disability ended.  Tr. 36.

18.     The medical improvement that has occurred is related to the ability to work because Finklea no longer has an impairment or combination of impairments that meets or medically equals the severity of a listing.  Tr. 36.

19.     Beginning June 2, 2013, Finklea has had the RFC to perform light work except he can stand and walk for a total of six (6) hours in an eight (8) hour workday with normal breaks and sit for a total of six (6) hours in an eight (8) hour workday with normal breaks.  He requires the option to sit or stand for ten seconds every 30 minutes without being off task. He can occasionally climb ramps and stairs, but never climb ladders, ropes and scaffolds; occasionally balance, stoop, kneel, crouch or crawl. He must avoid high concentrations of heat, cold, humidity, smoke, fumes, dust and pollutants. He must avoid all exposure to dangerous machinery and unprotected heights. He has the ability to perform simple, routine tasks including tasks that would take more than three (3) months and up to six (6) months to learn. He can perform low stress tasks meaning no high production quotas, no piece rate work or work involving arbitration, confrontation, negotiation, supervision or commercial driving.  Tr. 36-40.

20.     Beginning June 2, 2013, Finklea has been capable of performing past relevant work as a shelter monitor, generally performed at the medium exertional level, but actually performed by Finklea at the light exertional level with an SVP of 3 (semi-skilled).  The work does not require the performance of work-related activities precluded by Finklea's current RFC as actually performed by Finklea.  Tr. 40.  Alternatively, considering Finklea's age, education, work experience and RFC, there are other jobs

that exist in significant numbers in the national economy that Finklea can also perform, including usher, ticket taker, and order caller. Tr. 41-42.

21.    Finklea's disability ended on June 2, 2013. Tr. 42.

## V. Parties' Arguments

Finklea argues that substantial evidence supports a finding that his impairments equaled Listing 1.02 prior to November 14, 2011, and therefore, the ALJ should have found him disabled as of January 14, 2011, his alleged onset date. Doc. 14, pp. 13-15. Finklea also argues that the ALJ did not conduct a proper credibility assessment with respect to his allegations of pain both prior to the closed period and after the closed period. Doc. 14, pp. 15-18.

In response, the Commissioner argues that substantial evidence supports the ALJ's finding that Finklea's impairments did not equal Listing 1.02 prior to November 14, 2011. Doc. 16, pp. 7-11. Also, the Commissioner argues that the ALJ properly considered Finklea's subjective complaints of pain. Doc. 16, pp. 11-15.

## VI. Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court may not overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.     Cessation of benefits**

Once the Commissioner has found a claimant disabled, a claimant's continued entitlement to benefits beyond the period for which disability was established is subject to a separate analysis.  20 C.F.R. § 404.1594 (a) and 20 C.F.R. § 416.994(a).  The central question is whether the claimant's medical impairments have improved to the point where she is able to perform substantial gainful activity.  42 U.S.C. § 423(f)(1); *Kennedy v. Astrue,* 247 Fed. Appx. 761, 764 (6th Cir. 2007). "There is no presumption of a continuing disability." *Id.*  (citing *Cutlip v. Sec't of Health and Human Servs.*, 25 F.3d 284, 286-287, n. 1 (6th Cir. 1994); *Nierzwick v. Comm'r of Soc. Sec.*, 7 Fed. Appx. 358, 362-363 (6th Cir. 2001) (same).  To determine whether a claimant's disability has ceased and that she is now able to work, the Commissioner applies the procedures set forth in 20 C.F.R. § 404.1594 and 20 C.F.R. § 416.994. *Kennedy*, 247 Fed. Appx. at 764; *Nierzwick*, 7 Fed. Appx. at 361.

The specific steps under 20 C.F.R. § 404.1594 and 20 C.F.R. § 416.994 that are followed by the Commissioner to review the question of whether a claimant's disability continues are as follows:

1.  For DIB claims only.[7]  Are you engaging in substantial gainful activity?  If you are, disability will end.

2.  Do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of subpart P of part 404 of this chapter?  If you do, your disability will be found to continue.

3.  If you do not, has there been medical improvement as defined in regulations?

4.  If there has been medical improvement, we must determine whether it is related to your ability to do work, i.e., whether or not there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination.

5.  If we found at the earlier step that there has been no medical improvement or if we found that the medical improvement is not related to your ability to work, we consider whether any of the exceptions under the section apply (20 C.F.R. § 404.1594(d) and (e) and 20 C.F.R. § 416.994(b)(3) and (b)(4)). If none of the exceptions apply, your disability will be found to continue. If one of the first group of exceptions to medical improvement applies, further analysis as set forth below is required. If an exception from the second group of exceptions to medical improvement applies, your disability will be found to have ended. The second group of exceptions to medical improvement may be considered at any point in this process.

6.  If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe (see 20 C.F.R. 404.1521 and 20 C.F.R. § 416.921). This determination will consider all your current impairments and the impact of the combination of these impairments on your ability to function. When the evidence shows that all your current impairments in combination do not significantly limit your physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature. If so, you will no longer be considered to be disabled.

7.  If your impairment(s) is severe, we will assess your current ability to do substantial gainful activity in accordance with 20 C.F.R. § 404.1560 and/or 20 C.F.R. § 416.960. That is, we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past. If you can do such work, disability will be found to have ended.

8.  If you are not able to do work you have done in the past, we will consider whether you can do other work given the residual functional capacity assessment made as part of this analysis and your age, education, and past work experience. If

---

[7] This step does not apply to SSI claims.

you can, we will find that your disability has ended. If you cannot, we will find that your disability continues.

20 C.F.R. § 404.1594 (f) and 20 C.F.R. § 416.994(b)(5).

The first part of the cessation analysis focuses on medical improvement. *Kennedy*, 247 Fed. Appx. at 764. "Medical improvement is any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled." 20 C.F.R. 404.1594(b)(1) and 20 C.F.R. § 416.994(b)(1)(i). Thus, "[i]mprovement is measured from 'the most recent favorable decision' that the claimant was disabled." *Kennedy*, 247 Fed. Appx. at 764; *see also White v. Colvin*, 2015 WL 1011393, * 4 (N.D. Ohio Mar. 6, 2015).

The second part of the cessation analysis focuses on whether the individual has the ability to engage in substantial gainful activity. *Kennedy*, 247 Fed. Appx. at 765. The implementing regulations for this part of the evaluation incorporate many of the standards set forth in the regulations that govern initial disability determinations. *Id.* "[T]he ultimate burden of proof lies with the Commissioner in termination proceedings." *Id*; *see also Nierzwick v. Comm'r of Soc. Sec.*, 7 Fed. Appx. 358, 361 (6th Cir. 2001); *White*, 2015 WL 1011393, * 4.

**C.      Reversal and remand is not required based on the ALJ's Step Three Analysis**

Finklea contends that the ALJ erred at Step Three by not fining that his impairment equaled Listing 1.02A prior to November 14, 2011.

At Step Three of the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). The claimant bears the burden of establishing that his condition meets or equals a Listing. *Johnson v. Colvin*, 2014 U.S. Dist. LEXIS 50941, *7 (6th Cir. 2014) (citing *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987). A claimant

"must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. SSA*, 93 Fed. Appx. 725, 728 (6th Cir. 2004).

Listing 1.02A states,

1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App.1.

Effective ambulation, defined in 1.00B2b, is as follows:

individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id*.

As Finklea acknowledges, Dr. Brovender testified at the hearing that Finklea equaled a listing starting on November 14, 2011, and ending on June 1, 2013. Doc. 14, p. 14; Tr. 109-11. The ALJ relied upon Dr. Brovender's medical expert testimony when concluding that Finklea's impairment equaled Listing 1.02 due to severe osteoarthritis of the hip from November 14, 2011, to June 1, 2013. Tr. 33-34 (finding Dr. Brovender's testimony "persuasive and well supported

by the evidence of record . . . [and] [i]t is therefore accorded the greatest weight."). Although Dr. Brovender initially testified that the closed period started on January 14, 2011, Dr. Brovender clarified that the closed the period started on November 14, 2011, explaining that his opinion was based on the fact that it was on November 14, 2011, when the x-ray revealed a fracture in the hip, that Finklea's condition would have become so severe that he would be unable to walk. Tr. 111.

Notwithstanding the medical expert's testimony, Finklea attempts to argue that evidence shows that his condition equaled the listing prior to November 14, 2011. Doc. 14, p. 14. He relies on evidence showing that Finklea complained of hip pain and was treated for hip pain in 2010, complained of increased pain, used a cane, received injections, and underwent physical therapy. Doc. 14, pp. 14-15. At the hearing, however, Finklea's counsel questioned Dr. Brovender regarding evidence upon which he relies and, as discussed above, Dr. Brovender explained that listing level severity did not occur until November 14, 2011, when there was evidence of a fracture. Tr. 110-111. Additionally, Dr. Brovender indicated that, in late 2010, surgery was only likely; Finklea did not need surgery at that point. Tr. 110-111.

Also, in addition to considering and relying upon Dr. Brovender's medical expert testimony, the ALJ considered the entirety of the record, including medical evidence predating November 14, 2011 (Tr. 19-23), and concluded that the evidence supported listing level severity only for the closed period of November 14, 2011, to June 1, 2013 (Tr. 17, 27-34). Thus, to the extent that Finklea requests that the Court weigh evidence already considered by the ALJ, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387. Moreover, Finklea points to no medical opinion evidence to support his claim that his condition equaled listing level severity prior to November

14, 2011. As indicated above, while Dr. Brovender initially testified that the closed period started on January 14, 2011, Dr. Brovender clarified that the closed the period started on November 14, 2011, explaining that his opinion was based on the fact that it was on November 14, 2011, when the x-ray revealed a fracture in the hip, that Finklea's condition would have become so severe that he would be unable to walk. Tr. 111.

For the reasons set forth above, the Court concludes that the ALJ did not err at Step Three by finding that Finklea's impairment equaled Listing 1.02 for the closed period of November 14, 2011, to June 1, 2013.

**D.** **The ALJ did not err in assessing the credibility of Finklea's subjective statements about his symptoms**

Finklea challenges the ALJ's credibility assessment, arguing that the ALJ conducted a credibility analysis but did not properly assess his reports of pain, both prior to and after the closed period. Doc. 14, pp. 15-18.

Social Security Ruling 96–7p and 20 C.F.R. § 404.1529 describe a two-part process for assessing the credibility of an individual's subjective statements about her symptoms. First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work.

When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of

pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c); Soc. Sec. Rul. 96–7p, *Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at 3 (July 2, 1996) ("SSR 96-7p").[8] "An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

As explained more fully below, the ALJ assessed the credibility of Finklea's subjective statements about his symptoms for the period prior to November 14, 2011, and for the period after June 1, 2013, and the ALJ's explanation of the assessment of Finklea's credibility during those periods is sufficiently explained and supported by substantial evidence.

### Prior to November 14, 2011

The ALJ acknowledged and considered Finklea's complaints of pain and his statements regarding the limiting effects of his pain (Tr. 18-19) but the ALJ did not find Finklea's statements concerning the intensity, persistence and limiting effects of his symptoms, including his reports of pain, entirely credible prior to November 14, 2011 (Tr. 23). The ALJ explained his assessment of Finklea's credibility, stating:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible prior to November 14, 2011, for the reasons explained in this decision. The record indicates that the claimant[] is sometimes noted to be noncompliant with prescribed medications. For

---

[8] SSR 16-3p, with an effective date of March 28, 2016, supersedes SSR 96-7p. 2016 WL 1119029 (March 16, 2016); 2016 WL 1237954 (March 24, 2016).

example, on November 4, 2010, the claimant is noted to [be] noncompliant with prescribed medication for hypertension (Exhibit 4F: 104). He is noted to again be noncompliant with his hypertension medication on December 22, 2010 (Exhibit 4F:92). Progress notes from March 4, 2011 indicate that the claimant has again failed to take his medication as he left it at a friend's house (Exhibit 4F:57). Physical therapy and follow up notes from March 31, 2011 indicate that physical therapy was limited due to noncompliance with his blood pressure medication further complicated by cocaine use (Exhibit 4F:39 to 41). In addition and although the claimant alleges onset of disability on January 14, 2011, the record as of April 5, 2011 indicates that the claimant continues to work in construction and on that date reported increased pain secondary to climbing ladders all day and doing electrical work, activity patently inconsistent with alleged disabling symptoms four months prior (Exhibit 4F:34). The claimant reported to a consultative examiner on September 9, 2011 that he had not abused cocaine for a year. However, [t]reatment records from his primary care physician dated March 31, 2011 indicate that he was using cocaine twice a week just six months prior to the consultative examination. (Exhibit 4F:39 to 41, Exhibit 5F:2). Further, the claimant tested positive for cocaine on November 28, 2011 suggesting that his cocaine abuse is not in remission (Exhibit 7F:50, repeated in Exhibit 8F:12). For these reasons, I can accord only partial credibility to the claimant.

Tr. 23.

Finklea claims that the credibility assessment is flawed because non-compliance with hypertension medication and consideration of Finklea's reports of cocaine use do not relate to Finklea's pain or orthopedic issues and the ALJ did not consider other evidence related to his orthopedic issues such as physical therapy, injections, emergency room treatment, and use of cane when assessing Finklea's credibility. Doc. 14, pp. 16-17.

Finklea has not shown that the ALJ's findings that he was non-compliant with medication or inconsistent in his statements regarding cocaine use are unsupported by the record. Furthermore, Finklea has not asserted a good reason for his failure to follow treatment recommendations regarding his hypertension medication and, as the record shows, his failure to comply with those recommendations interfered with physical therapy as well as his ability to have surgery at an earlier date. Tr. 23, 1447, 1771, 1773. Additionally, Finklea appears to ignore the fact that the ALJ also found Finklea's statements only partially credible because on

April 5, 2011, Finklea reported working all day climbing ladders and doing electrical work, "activity [the ALJ found] patently inconsistent with alleged disabling symptoms four months prior (Exhibit 4F:34)." Tr. 23, 1440.

Finklea has not shown that it was improper for the ALJ to take into account lack of compliance with prescribed treatment and/or inconsistencies in Finklea's statements when assessing the credibility of his statements. *See* SSR 96-7p, * 6 (When assessing credibility, an ALJ can consider "consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work."); SSR 96-7p, * 7 (An "individual's statements may be less credible . . . if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.").

Also, contrary to Finklea's contention, the ALJ did not ignore other evidence, including evidence of physical therapy, injections, emergency room treatment, and use of a cane. For example, the ALJ discussed physical therapy records prior to November 14, 2011, stating:

> . . . Physical therapy assessment on December 1, 2010 indicates an altered gait, decreased hip active range of motion bilaterally and decreased hip strength. The claimant reports the capacity to walk for about 25 minutes with difficulty bending down, squatting, climbing stairs and rising from a sitting position. (Exhibit 4F:96 to 99). Physical therapy notes indicate that the claimant responded well to manual therapy as it reduced his reported pain down to 0 of 10. However, although compliance with his blood pressure medication, therapy was ended when his blood pressure rose to an unacceptable level. He was advised that he would be discharged from physical therapy if he does not stabilize his blood pressure. (Exhibit 4F:67). Physical therapy from March 31, 2011 was limited due to the claimant's uncontrolled blood pressure. However, at this visit he reports no hip pain. . .
>
> Physical therapy notes dated April 5, 2011 indicate that the claimant reports pain at 5 out of 10 due to climbing ladders and doing electrical work all day (Exhibit 4F:34). . .

Tr. 20.   The ALJ considered evidence regarding steroid injections.  Tr. 23 ("The claimant received steroid injections on April 20, 2011 and again on September 29, 2011 with limited and temporary relief . . . ).   The ALJ considered evidence of emergency room treatment for hip pain. Tr. 20 ("The claimant presented for emergency room treatment of severe left hip pain on April 15, 2011 and received Percocet to control his pain.  It is noted that an x-ray of his lumbar spine revealed only mild degenerative disc disease at L4-5 and mild to moderate degenerative disc disease at T11-12.").  The ALJ also considered reports that Finklea used a cane to assist him with ambulation.  Tr. 19.

Taking into consideration the entirety of the record, the ALJ assessed the credibility of Finklea's statements regarding the limiting effects of his pain and sufficiently explained his credibility assessment.   The ALJ did not discount Finklea's pain complaints in total but rather found Finklea's statements only partially credibile and assessed a sedentary RFC prior to November 14, 2011.  Tr. 18.  Considering the deference afforded an ALJ's credibility determination and that Finklea has failed to demonstrate that the ALJ's credibility assessment is not supported by substantial evidence, the Court finds no basis upon which to reverse or remand the Commissioner's decision based on the ALJ's credibility assessment for the period prior to November 14, 2011.

*After June 1, 2013*

The ALJ explained his reasons for finding Finklea's allegations regarding the limiting effects of his pain for the period after June 1, 2013, less than fully credible, stating:

> After considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.  I note references in the record to the claimant's continued noncompliance with recommended treatment.   For example, treatment notes

throughout the record consistently indicate that the claimant is noncompliant with recommended treatment for his hypertension. In addition, his failure to schedule follow up treatment with Dr. Kolawole and discharge from treatment with a diagnosis of history of depression and references to the claimant working as a repairperson and operating a painting business is inconsistent with the alleged disabling severity of the claimant's impairments. Further, the suggestion of malingering and/or symptom exaggeration during the claimant's consultative examination with Dr. Pickholtz makes according any more than partial weight to the claimant untenable.

Tr. 38-39.

Finklea argues in a conclusory manner that the ALJ did not conduct a proper pain analysis, pointing to evidence of complaints of low back and left hip pain, evidence that Finklea received a Toradol injection, and evidence of obesity and the need for attendance at a nutrition clinic. Doc. 14, p. 17. However, the evidence referred to by Finklea was considered by the ALJ (Tr. 36-38) and it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387. Furthermore, Finklea has not shown that the ALJ's credibility assessment for the period after June 1, 2013, is not supported by substantial evidence. For example, the record reflects that, after June 1, 2013, Finklea reported that he was working part-time as a repairman. Tr. 2649. As found by the ALJ, this type of activity was inconsistent with Finklea's subjective complaints regarding the severity of his impairments. Tr. 38.

The ALJ did not discount Finklea's pain complaints in total but rather found Finklea's statements only partially credible and assessed an RFC limiting Finklea to a reduced range of light work beginning June 2, 2013. Tr. 36. Considering the deference afforded and ALJ's credibility determination and that Finklea has failed to demonstrate that the ALJ's credibility assessment is not supported by substantial evidence, the Court finds no basis upon which to

reverse or remand the Commissioner's decision based on the ALJ's credibility assessment for the period beginning on June 2, 2013.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: June 16, 2017

_____
Kathleen B. Burke
United States Magistrate Judge